# United States Court of Appeals for the Federal Circuit

2008-5179

JEFFREY G. WALLS,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.


Rebecca A. Koch, Kirkland & Ellis LLP, of Washington, DC, argued for plaintiff-appellant.  With her on the brief was Colin R. Kass.

Kent Kiffner, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  On the brief were Jeanne E. Davidson, Director, Steven J. Gillingham, Assistant Director, and Douglas G. Edelschick, Trial Attorney.  Of counsel on the brief was David W. Fink, Litigation Attorney, Office of the Judge Advocate General, United States Department of the Navy, of Washington, DC.

Appealed from:  United States Court of Federal Claims

Judge Margaret M. Sweeney

# United States Court of Appeals for the Federal Circuit

2008-5179

JEFFREY G. WALLS,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 05-CV-533, Judge Margaret M. Sweeney.

_____

DECIDED:  September 29, 2009

_____

Before NEWMAN, GAJARSA, and DYK, Circuit Judges.

Opinion for the court filed by Circuit Judge DYK.  Dissenting opinion filed by Circuit Judge NEWMAN.

DYK, Circuit Judge.

Jeffrey G. Walls ("Walls") appeals from a judgment of the United States Court of Federal Claims.  The Court of Federal Claims rejected Walls's contention that he was improperly transferred to the Fleet Reserve after his active duty service in the United States Navy, and rejected Walls's claim for back pay based on his allegedly improper transfer.  The Court of Federal Claims also rejected Walls's alternative claim for back pay based on his alleged performance of military duties during a period of medical

treatment after his transfer. <u>Walls v. United States</u>, No. 05-533C, 2008 WL 4708115 (Fed. Cl. July 30, 2008). We affirm-in-part, vacate-in-part, and remand.

BACKGROUND

Walls asserts two separate claims. For clarity we describe them separately.

I The Improper Transfer Claim

Walls served on active duty in the United States Navy ("Navy") from September 2, 1980, through September 30, 2000. After twenty years of active duty service, enlisted personnel in Walls's pay grade could not re-enlist, but instead could either separate from the Navy, retire for disability, or transfer to the Fleet Reserve.[1] On September 30, 2000, Walls was transferred to the Fleet Reserve. Walls contends that the transfer was improper.

Walls agrees that under the Navy's regulations, such a transfer to the Fleet Reserve "may only be deferred [1] if the member is hospitalized or [2] a medical board ["MEB"] report has been accepted by the President, PEB ["Physical Evaluation Board"] for disability evaluation processing. 10 U.S.C. § 640 applies."[2] U.S. Dep't of Navy, Sec'y of the Navy Instr. 1850.4D, Department of the Navy Disability Evaluation Manual

---

[1]    Walls was not eligible for retirement pay under "voluntary retirement," which requires thirty years of active service. <u>See</u> 10 U.S.C. § 6326. In September 2000 Walls was in pay grade E6, which allowed re-enlistment "up to a maximum of 20 years day-for-day active service." Chief of Naval Operations Instruction 1160.5C, § 5(b)(4) (Oct. 18, 1993).

[2]    Section 640 remains in effect, although its language has been changed slightly since the version of the statute that applied to Walls in 2000. <u>Compare</u> 10 U.S.C. § 640 (2006), <u>with</u> 10 U.S.C. § 640 (2000). Although the statute refers only to "officers," the Navy regulations incorporating § 640 apply to enlisted personnel. <u>See</u> SECNAVINST 1850.4D, § 2043 ("Unless otherwise defined, a 'member' may be a[n] . . . enlisted person of the regular or reserve forces.").

§ 3710 (Dec. 23, 1998) ("SECNAVINST"); see also Military Personnel Manual 1830-40, Transfer to the Fleet Reserve and Release from Active Duty (March 27, 2000) ("MILPERSMAN"); MILPERSMAN 1830-30, Physical Examination in Connection with Retirement, Transfers to Fleet Reserve, and as a Fleet Reservist. As discussed in greater detail below, the PEB process referenced in the regulations is designed to determine whether a service member has become permanently disabled and should be separated or retired for disability, and the referenced statute (10 U.S.C. § 640) exclusively concerns separation and retirement for disability.[3]

In past cases we have considered claims that injured service members were improperly denied disability retirement. See, e.g., Fisher v. United States, 402 F.3d 1167 (Fed. Cir. 2005) (en banc in part); Heisig v. United States, 719 F.2d 1153 (Fed. Cir. 1983). However, Walls does not claim that he was permanently disabled or that he was entitled to disability retirement. He asserts that he should have been given corrective medical treatment before his transfer to the Fleet Reserve.

In this respect, the factual basis for Walls's improper transfer claim is relatively straightforward. He alleges that during his Navy service he was assigned to an aircraft carrier, and that around 1984 he injured his knee and back during an aircraft launch accident. Am. Compl. ¶¶ 28–29. Walls alleges that an F-18 fighter jet was launched while Walls was on deck, blowing him across the flight deck and causing injuries. Id. He asserts that he suffered permanent damage from the incident, and that for years

---

[3]    Not all permanent disabilities lead to disability severance or disability retirement. See 10 U.S.C. § 1201(b)(2) (disallowing disability retirement benefits if the disability is "the result of the member's intentional misconduct or willful neglect" or was "incurred during a period of unauthorized absence").

thereafter he suffered pain. The pain increased about eighteen months before the date of his separation. As part of the process for transferring to the Fleet Reserve, Walls had a physical in June 2000 "to permit correction of any minor physical defects or identification of those requiring processing for disability retirement, if disability retirement is indicated, prior to the date otherwise scheduled for retirement." See MILPERSMAN 1830-030, at 1. The physician's report indicated Walls had "[r]ecurrent back pain" and a "'[t]rick' or locked knee" but that Walls was in "good" health and taking no medications. In early August 2000, Walls experienced knee and back pain and was examined by Dr. Cullom, a Navy physician. In late August 2000, Walls received an MRI scan that showed he had scoliosis and mild to moderate spinal stenosis; a June 1999 spinal x-ray had also shown "significant" scoliosis. A medical report from Walls's September 2000 appointment with Dr. Helm, a neurosurgeon, indicated that Walls did not require surgery and that chiropractic care and pain management might be helpful. Walls was seen by Dr. Cullom again after his MRI scan. Walls does not assert that Dr. Cullom thought he was eligible for disability retirement; instead, Walls alleges that Dr. Cullom "told him that he was not fit to retire due to his injuries" and that "she would recommend . . . that he be placed on 'medical hold,' which would keep him on active duty past his scheduled retirement date so that he could be adequately treated for his medical problems before his retirement." Am. Compl. ¶ 39. Walls argues that he should not have been transferred until the necessary treatment was completed.

In November 2000, Walls petitioned the Board of Correction for Naval Records ("BCNR" or "corrections board") for correction of his service records, requesting "to remain on active duty in a medical hold status, until my injury can be corrected" and

asserting that he "was release[d] from the military with a[n] injury that should have been corrected." In August 2001, the corrections board denied Walls's petition. Walls requested reconsideration by the corrections board, and the corrections board denied this request in November 2001. Walls again requested reconsideration by the corrections board, providing additional evidence, and in December 2002 the corrections board again denied his request, finding that the new evidence was not material. In April 2003, Walls again unsuccessfully requested that the corrections board reconsider its decision not to extend his release from active duty by six months and not to award him back pay for those six months.[4]

In May 2005, Walls filed a complaint in the Court of Federal Claims, asserting claims that his transfer should have been deferred pending medical treatment and requesting back pay from September 30, 2000, through March 30, 2001, as well as additional relief. See Compl. ¶ 10 (alleging Walls's "retirement should have been withheld until his medical condition could be corrected or resolved by the United States Navy"); Am. Compl. ¶¶ 39, 58 (alleging that Walls's BCNR petition requested retention "on medical hold status pending the completion of his medical treatment"). The Court of Federal Claims remanded Walls's case to the corrections board for further development of the record in August 2005.

In May 2006, the BCNR issued its remand decision, finding that Walls had not been hospitalized prior to his transfer, that no MEB had been initiated for him, and that he had been fit to reasonably perform his duties. The corrections board found that there

---

[4] In late 2002, the Veterans Administration ("VA") awarded Walls a twenty percent disability rating for his service-connected chronic low back strain and a ten percent disability rating for his service-connected left knee ligament injury.

was no credible evidence of Walls's "inability to perform military duty," and thus that there was "no basis for initiating a medical board." App. 94. The corrections board also found that even if an MEB had been initiated, it was unlikely that Walls could have rebutted the presumption of fitness that applies to enlisted service members within twelve months of their mandatory separation or transfer. Id.; see SECNAVINST 1850.4D, § 3305(b)(4).[5]

Walls filed an amended complaint in the Court of Federal Claims in August 2007, seeking back pay and allowances from September 30, 2000, through mid-May 2001, as well as injunctive relief ordering correction of his naval records "to properly reflect his service to the Navy through the middle of May 2001" and attorney fees and costs. Am. Compl. ¶ 7. Walls alleged that the Navy had violated its own regulations in failing to extend his active duty service by placing him on "medical hold" pending an MEB and PEB review process. As an attachment to his amended complaint, Walls provided a new sworn declaration dated August 8, 2007, that was not presented to the corrections board.

The United States ("the government") moved to dismiss Walls's complaint, or in the alternative for judgment on the administrative record. The Court of Federal Claims concluded that before Walls's transfer he had not been hospitalized, that no MEB report

---

[5]    SECNAVINST 1850.4D, § 3305(c)(1) provides that the presumption of fitness would be overcome if during the twelve months before separation "a serious deterioration of a previously diagnosed condition, to include a chronic condition, occurs and the deterioration would preclude further duty if the member were not retiring," or "an acute, grave illness or injury occurs that would prevent the member from performing further duty if he or she were not retiring." The presumption would be "considered to have been overcome" if the natural progression of the condition "normally results in either significant life-span reduction/death or deterioration to the point where it could warrant a permanent disability rating of 60 percent." Id.

had been accepted by the PEB, and that there had been no violations of regulations in failing to convene an MEB. The court found that Walls failed to state a claim on which relief could be granted.

## II The Full-Time Duty Claim

Walls alleges that after his transfer he was admitted to a hospital. Walls claims, assuming that he was properly transferred to the Fleet Reserve, that he is entitled to back pay for the period from October 2000 to May 2001 for performing "other full-time duty" under 37 U.S.C. § 204(a)(2). He asserts that while he received treatment at the National Naval Medical Center ("NNMC") during this period, he performed military duties at the NNMC. Walls initially presented this claim to the Court of Federal Claims, which remanded to the BCNR to consider the claim in the first instance.

On May 17, 2006, the corrections board concluded that Walls was not entitled to any reimbursement because there was no evidence that Walls performed military duties at the NNMC. Walls then sought review of that decision in the Court of Federal Claims and filed an affidavit with the court in August 2007, providing details of his alleged military duties at the NNMC. The Court of Federal Claims concluded that "in military pay cases [review] is not limited to the administrative record but may also encompass de novo evidence." Walls, 2008 WL 4708115, at *18. The court found that Walls's allegations were sufficient to state a claim, but affirmed the BCNR's decision on the administrative record. The court concluded that because there was no affirmative evidence—aside from Walls's post-BCNR affidavit—that Walls performed any military duties at the NNMC, the BCNR did not err in finding that Walls was not entitled to back pay.

Walls timely appealed to our court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).[6]

## DISCUSSION

We review legal determinations of the Court of Federal Claims, such as a dismissal for failure to state a claim or a judgment on the administrative record, without deference. Greenlee County, Ariz. v. United States, 487 F.3d 871, 877 (Fed. Cir. 2007); Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir. 2006).[7]

### I

We first consider Walls's claim that his transfer to the Fleet Reserve should have been deferred pending treatment for his medical problems. As noted earlier, Navy regulations require service members being transferred to the Fleet Reserve to have a physical examination within six months before their transfer "to permit correction of any minor physical defects or identification of those requiring processing for disability retirement, if disability retirement is indicated, prior to the date otherwise scheduled for retirement." MILPERSMAN 1830-030, at 1.

If a service member's medical problems are not corrected before the transfer date, they may be addressed after transfer to the Fleet Reserve. Transfer may be delayed in only two situations: (1) where the service member is hospitalized at the time originally scheduled for transfer, or (2) where the PEB process "for disability evaluation

---

[6] Walls was represented before our court pro bono by Colin R. Kass and Rebecca A. Koch. We thank Walls's counsel for their service.

[7] Walls's claims for back pay are justiciable. See Fisher, 402 F.3d at 1177 ("Though the question of fitness to serve may be nonjusticiable in various contexts, we have consistently noted that a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue.").

2008-5179                                          8

processing" has been initiated at the time originally scheduled for transfer. Thus, as noted earlier, the regulations provide, "If a member is pending mandatory separation or retirement, such retirement or separation may only be deferred if the member is hospitalized or a medical board report has been accepted by the President, PEB for disability evaluation processing." SECNAVINST 1850.4D, § 3710; see also MILPERSMAN 1830-040, at 4 ("Member . . . for whom transfer to the Fleet Reserve is mandatory, may only be deferred if the member is hospitalized or a medical board report has been accepted by the President, PEB for processing under SECNAVINST 1850.4D, article 3710."); MILPERSMAN 1830-030, at 2 ("Members pending a mandatory retirement or required to transfer to the Fleet Reserve in lieu of separation . . . will not be delayed unless member is either hospitalized or a medical board report has been accepted by the Physical Evaluation Board (PEB) for disability evaluation processing prior to the mandatory retirement date.").

We first consider Walls's claim that he was hospitalized before his transfer to the Fleet Reserve on September 30, 2000. In his amended complaint, Walls alleges that he was hospitalized in October 2000 at the NNMR. Am. Compl. ¶ 42. Walls argues that this hospitalization should be viewed as beginning in September 2000, before his transfer, when Dr. Cullom indicated that she would recommend that Walls be placed on medical hold. Walls contends that MILPERSMAN 1830-40 (entitled "Transfer to the Fleet Reserve and Release from Active Duty") applies, rather than MILPERSMAN 1830-30 (entitled "Physical Examination in Connection with Retirement, Transfers to Fleet Reserve, and as a Fleet Reservist"). We see no substantive difference between the two provisions. MILPERSMAN 1830-40 allows deferral of a mandatory transfer to the Fleet

Reserve "if the member is hospitalized . . . under SECNAVINST 1850.4D, article 3710," while MILPERSMAN 1830-30 allows deferral of a mandatory transfer to the Fleet Reserve if a "member is . . . hospitalized . . . prior to the mandatory retirement date." Nor does the reference in SECNAVINST 1850.4D, § 3710, to 10 U.S.C. § 640 suggest that transfer should be deferred absent an actual hospital admission.[8]

Thus, we see no basis for finding that Walls was hospitalized before he was admitted to a hospital. To "hospitalize" is "to place in a hospital as a patient." Webster's Third New International Dictionary 1094 (Merriam-Webster 2002); see also Webster's Unabridged Dictionary 924 (Random House 2d ed. 1998) (defining "hospitalize" as "to place in a hospital for medical care or observation"). The parties agree that Walls was not admitted to a hospital until after his transfer to the Fleet Reserve. Walls thus did not meet the hospitalization criterion for deferring his transfer to the Fleet Reserve.

Walls's second contention is that an MEB must be convened if a service member's fitness for duty is "questionable," and that an MEB should have been convened because Walls's fitness for duty was questionable. Walls similarly contends that the MEB should have referred the matter for PEB processing because of questionable fitness. He claims that the corrections board and the Court of Federal Claims failed to apply the proper standard of "questionable" fitness.

We think Walls misunderstands the purpose of the PEB process. That process is designed to identify individuals who should be separated or retired for disability because

---

[8] Section 640 provides for deferral if evaluation and determination of entitlement to disability separation or retirement "require hospitalization or medical observation that cannot be completed before the date on which the officer would otherwise be required to retire or be separated." 10 U.S.C. § 640 (2000) (effective through December 27, 2001).

of a permanent disabling medical condition—not to identify those individuals requiring further treatment for a temporarily disabling condition. Section 3710 of SECNAVINST 1850.4D states that "10 U.S.C. § 640 applies," and this statute provides for deferment of retirement or separation "if the evaluation of the physical condition of the officer and determination of the officer's <u>entitlement to retirement or separation for physical disability</u> require hospitalization or medical observation that cannot be completed before the date on which the officer would otherwise be required to retire or be separated." 10 U.S.C. § 640 (2000) (effective through December 27, 2001) (emphasis added). The legislative history of this provision further indicates that such a deferral is not for treatment but for disability evaluation. The House Report accompanying § 640 states that the statute allows, "in the event hospitalization or medical observation is necessary to determine entitlement . . . to retirement or separation for physical disability . . . retirement or separation can be deferred by the secretary concerned." H.R. Rep. No. 96-1462, at 78 (1980). The reference to 10 U.S.C. § 640 in SECNAVINST 1850.4D, § 3710, thus confirms that deferral of a mandatory transfer is not for medical treatment but is instead for evaluating disability separation or retirement.

This purpose is confirmed by other regulatory provisions. A case enters the Navy's Disability Evaluation System when an MEB "is dictated for the purpose of evaluating the diagnosis and treatment of a member who is unable to return to military duty because the member's condition most likely is <u>permanent</u>." SECNAVINST 1850.4D, § 3102(a) (emphasis added). Pursuant to SECNAVINST 1850.4D, the PEB "decides Unfitness to continue naval service" and whether "<u>the member is eligible for disability benefits</u>." § 10001, at 10-3 to 10-4 (Dec. 23, 1998) (emphasis added).

Navy regulations state that "[a]s a general rule, an active duty member . . . will be referred for <u>disability evaluation</u> only by a medical board that has found the member's <u>Fitness for continued active service questionable</u> by reason of physical or mental impairment."   SECNAVINST 1850.4D, § 3201(a) (emphases added).   What is "questionable" in the PEB system is whether a service member's condition is permanently disabling, not whether a service member needs medical treatment.

> A case enters the Department of the Navy [Disability Evaluation System] when a Medical Evaluation Board (MEB) is dictated for the purpose of evaluating the diagnosis and treatment of a member who is unable to return to military duty <u>because the member's condition most likely is permanent</u>, and/or any further period of temporary limited duty (TLD) is unlikely to return the member to full duty.

SECNAVINST 1850.4D, § 3102(a) (emphases added).   Our caselaw similarly has described the PEB process as a disability retirement evaluation process.  <u>See, e.g.</u>, <u>McHenry v. United States</u>, 367 F.3d 1370, 1372–73 (Fed. Cir. 2004) ("In order to determine the existence and extent of disability, the Secretary established a PEB in 1990 to act on behalf of the Secretary of the Navy . . . in making determinations of fitness for duty, entitlement to benefits, and disposition of service members referred to the Board." (quotation marks omitted)); <u>Moyer v. United States</u>, 190 F.3d 1314, 1316 (Fed. Cir. 1999) (describing an MEB as part of a process "which ordinarily can lead to a discharge based upon disability").[9]

Walls's assertion that the PEB is concerned with determining the need for corrective medical treatment is not supported by the Navy's regulations.  To be sure, an

MEB may be convened for purposes other than determining whether a permanent disability exists and referring the matter to a PEB. An MEB may be convened "to identify members whose physical and/or mental qualification to continue on full duty is in doubt or whose physical and/or mental limitations preclude their return to full duty within a reasonable period of time." SECNAVINST 1850.4D, § 2042. MEBs "evaluate and report on the diagnosis; prognosis for return to full duty; plan for further treatment, rehabilitation, or convalescence; estimate of the length of further disability; and medical recommendation for disposition of such members." Id. An MEB may recommend temporary light duty for a period of thirty days "for the purpose of evaluation or treatment of a medical condition." SECNAVINST 1850.4D, § 1008. The regulations also provide that if a service member "is unable to return to full military duty at the end of 30 days of light duty, the member will be placed in [medical treatment facility] Medical Hold for up to 30 additional days, pending evaluation by a Medical Board for the purpose of placement on [temporary limited duty] or referral to the PEB." Id.

Even if Walls were correct that an MEB should have been convened because of his questionable fitness for duty and the need to consider medical treatment, there is no basis for his claim that the convening of an MEB (without PEB processing) would have deferred his separation. The regulations do not authorize deferral of mandatory separation based either on the convening of an MEB or the imposition of a medical hold. Indeed, section 3710 of SECNAVINST 1850.4D is quite clear that separation will

---

[9] See also Manual of the Medical Department, art. 18-25(1) (Jan. 10, 2005) ("MANMED") ("For patients whose care is deferrable and/or elective, it is not appropriate for [medical treatment facilities] caring for patients with an impending separation date who present with conditions for which care is deferrable and elective to attempt to forestall the established separation or retirement date.").

be deferred only if the service member is being processed by the PEB for permanent disability separation or retirement pursuant to 10 U.S.C. § 640.[10] Because Walls is not claiming entitlement to disability retirement, Walls thus cannot meet the condition for deferring his transfer to the Fleet Reserve based on PEB processing.

II

Assuming his transfer to the Fleet Reserve was proper, Walls alternatively claims entitlement to back pay under 37 U.S.C. § 204(a)(2) for performing "other full-time duty" during his medical treatment at the NNMC from October 2000 through mid-May 2001. Walls provided details of his alleged military duties at the NNMC only to the Court of Federal Claims in his 2007 amended complaint and its attached affidavit, rather than to the BCNR before its 2006 remand decision. The government argues that Walls, having failed to present this evidence to the BCNR, was barred from presenting it to the Court of Federal Claims, and that thus no evidence supported Walls's compensation claim. Walls argues that the Court of Federal Claims could properly consider his affidavit, even though it was not before the BCNR, relying on the 1968 decision of our predecessor court where we held that a reviewing court could consider "evidence over and above that presented before the administrative boards if a party wishes to offer it."

---

[10] The Navy's Manual of the Medical Department defines "elective care" as treatment that "could be performed at another time or place without jeopardizing the patient's life, limb, health, or well-being," and also states that "[i]n cases involving would-be retirees and 'elective' care, the requirement to maintain the member on active duty is not compelling in many cases, as retirees still have Federally-mandated access to care within the direct care infrastructure of the [Military Health System]. Only in those cases where the would-be retiree can assert an impact on any potential disability determination status should consideration of retention on active duty be entertained." MANMED art. 18-25(1)(b)(2), 18-25(1)(c).

Brown v. United States, 396 F.2d 989, 991 (Ct. Cl. 1968); see also Beckham v. United States, 375 F.2d 782, 785 (Ct. Cl. 1967).

After our decision in Brown, it has become well established that judicial review of decisions of military correction boards is conducted under the APA.[11] Also after Brown, the Supreme Court has established that review under the APA is generally limited to the administrative record. In Florida Power & Light Co. v. Lorion, the Supreme Court stated that "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." 470 U.S. 729, 743–44 (1985). If the record is inadequate, "[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry," and instead "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Id. at 744.[12] The Court emphasized that "[t]he focal point for judicial review should be the administrative record already in existence,

---

[11]      See, e.g., Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006) (noting that the Court of Federal Claims reviews decisions of a military corrections board "under the same standard as any other agency action"); Fisher, 402 F.3d at 1180 (holding that our review of a military correction board applies "essentially the standard under which administrative agency decisions are reviewed"); Gillan v. Winter, 474 F.3d 813, 817 (D.C. Cir. 2007) ("[B]ecause the BCNR decision was also a final agency action, the APA requires us to determine whether it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"); Kreis v. Sec'y of the Air Force, 866 F.2d 1508, 1514 (D.C. Cir. 1989) ("[D]ecisions of the [Corrections] Board are reviewable under the APA . . . .").

[12]      The Court of Federal Claims has authority under the Tucker Act to remand to a corrections board. See 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."). The corrections board has the authority to conduct an evidentiary hearing. See 32 C.F.R. §§ 723.3(e), 723.4.

not some new record made initially in the reviewing court." Id. at 743 (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)); cf. Marsh v. Or. Natural Res. Council, 490 U.S. 360, 375–78 (1989).

We recently reaffirmed the principle that parties must make the administrative record before the agency in Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009), where we stated that "[t]he focus of judicial review of agency action remains the administrative record, which should be supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." See also Levine v. United States, 453 F.3d 1348, 1350 (Fed. Cir. 2006); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Similarly, we have also recently ruled that review of a military corrections board is limited to the administrative record:

> [W]hen a service member does pursue such relief [from a military corrections board], the Court of Federal Claims reviews the Board's action under the same standard as any other agency action. Thus, the Court of Federal Claims should have applied its ordinary standard of review to those disputes of fact occurring in the proceedings at the Board: "whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." This necessarily limits the Court of Federal Claims' review to the administrative record.

Metz, 466 F.3d at 998 (citations omitted, emphasis added).[13]

We need not, however, in this case decide whether Brown is good law in the light of subsequent Supreme Court authority. Under Brown itself, "[s]hould it become clear in a particular case that a claimant has held back evidence in order to offer it in court, the

---

[13] "This is not to say that the Court of Federal Claims loses its ability to hold evidentiary hearings to determine jurisdictional facts, or to consider 'extra-record' evidence in extremely limited situations." Metz, 466 F.3d at 998.

obvious and simple remedy is to exclude it." 396 F.2d at 998–99. Here, the corrections board specifically requested "a statement of . . . the military duties you performed, if any, during the 1 July–30 September 2000 and 1 October–31 March 2001 periods." App. 101. Walls did not respond to the request, App. 90, instead waiting until filing his amended complaint in the Court of Federal Claims to provide his declaration supporting his claim. There is no suggestion that the declaration could not have been submitted to the corrections board. Under these circumstances Walls could not withhold his declaration from the corrections board and then submit it in the first instance to the Court of Federal Claims. This is not one of those situations where supplementation of the administrative record is appropriate. See, e.g., Impresa Construzioni, 238 F.3d at 1338–39.

Walls here submitted no evidence to the BCNR supporting his claim for back pay. Ordinarily this would require affirmance. However, under the circumstances raised in this case, we think it is appropriate that Walls be given an additional opportunity to present his evidence to the BCNR.

We vacate the judgment of the Court of Federal Claims and remand to the Court of Federal Claims, with direction to remand to the BCNR, for consideration of Walls's 2007 affidavit on the question of whether he was entitled to active duty pay from October 2000 through mid-May 2001 based on the performance of duties after his transfer.

CONCLUSION

We affirm the judgment of the Court of Federal Claims that Walls's transfer to the Fleet Reserve was not improper. We vacate the judgment of the Court of Federal

Claims rejecting Walls's claim for back pay from October 2000 to mid-May 2001 based on his post-transfer service, and remand to the Court of Federal Claims so that the court may remand to the BCNR for consideration of Walls's evidence regarding his alleged post-transfer service at the NNMC.

<u>AFFIRMED-IN-PART</u>, <u>VACATED-IN-PART</u>, AND <u>REMANDED</u>

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

2008-5179

JEFFREY G. WALLS,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 05-CV-533, Judge Margaret M. Sweeney.

Newman, Circuit Judge, dissenting.

Petty Officer Jeffrey G. Walls took this appeal from the decision of the Court of Federal Claims, which in turn reviewed a decision of the Board for the Correction of Naval Records. Two issues were raised: first, whether Mr. Walls' transfer to the Fleet Reserve should have been delayed because of his health, and second, whether he should be compensated for services he performed while undergoing treatment at the National Naval Medical Center. As to the second issue, the Correction Board held that he had not established that he performed compensable services, and Mr. Walls, who had not been represented by counsel until the Court of Federal Claims, sought to remedy this gap by placing information about these services in an affidavit that he

submitted to the court. The court considered this information along with the record that was provided by the Correction Board, as precedent authorizes, and held that Mr. Walls had not established entitlement to compensation.

My colleagues now state that the Court of Federal Claims committed an important procedural error in permitting Mr. Walls to submit supplemental information, and that such leniency will not be available in the future. Thus my colleagues reach out to change long-standing precedent governing judicial review of military correction board decisions, and rule that the reviewing trial courts no longer have discretion to receive supplemental information, and are limited to the record provided by the correction boards. This issue was not raised in this case; this new rule is unnecessary, its adoption exceeds the panel's authority, and the new rule is hostile to petitioners who seek relief through the informal proceedings of the military correction boards, only to learn that this informality may doom their appeal. I must, respectfully, dissent.

I

This question of whether the record from a military correction board can be augmented in the trial court was definitively answered, in the affirmative, over forty years ago in Brown v. United States, 396 F.2d 989, 991 (Ct. Cl. 1968), reflecting decades of prior practice. The answer continued to be respected, until today. The Brown ruling was not challenged in this appeal, and the issue was not briefed and argued. Contrary to my colleagues' proposal, this procedure has not been undermined

or overruled. This discretionary procedure should continue to be available in the trial courts that review decisions of correction boards.[1]

The correction boards were established to facilitate resolution of some types of concerns of military personnel, in a relatively informal proceeding managed by "civilians of the executive part of that military department." 10 U.S.C. §1552(a)(1). The court now would require that every such proceeding must contain every legalistic and evidentiary variant that might be helpful should the matter require appeal, on pain of waiver and bar of such evidence and argument should the serviceman believe that the correction board erred. This approach not only violates the rules of accommodation to pro se petitioners, but also raises important questions about the role of the military correction boards in assuring that military petitioners have built a record suited to this court's rigorous scrutiny.

In Brown the Court of Claims responded to the identical argument now revived by my colleagues, although in Brown the question of whether the court's acceptance of new evidence in its Tucker Act review of correction board decisions was compatible with the principles of the Administrative Procedure Act ("APA") was raised by the government.[2] The court discussed the military correction boards in the context of the spectrum of administrative tribunals, some of which provide formal hearings in lawyer-

---

[1] As I discuss post, the correction board statute does not provide for judicial review; such review reaches the Court of Federal Claims and the district courts under 28 U.S.C. §1491 ("Tucker Act") and 28 U.S.C. §1346(a)(2) ("Little Tucker Act").

[2] The panel majority intimates that the court in Brown did not consider the APA, arguing that the applicability of the APA only became clear "[a]fter our decision in Brown." Maj. op. at 15. That is incorrect. The Brown court explicitly discussed the scope of review permitted by the APA and the reasons for modification of the "usual" practice with respect to the correction boards. The Court of Claims was not a stranger to the APA, and the discussion in Brown was an informed analysis.

conducted proceedings with high monetary stakes, and some of which are attuned to the pro se petitioner seeking redress of a personal concern. The court observed the differences among the authorizing statutes for the various agencies, remarking that the statute establishing the military correction boards does not mention judicial review at all. The nature of the review of the correction boards in light of this statutory silence was not a simple question, and was determined in Brown only after careful analysis. The panel majority does not discuss this precedent that binds us, and does not acknowledge the rationale in support of that decision. When the Brown decision is consulted, the conflicts assigned by my colleagues simply dissolve. The question that the panel majority purports to answer was raised and answered in 1968, and has been consistently followed. The procedure is fair, and it is the law if it is to be changed, the court must act en banc.

A

The Brown decision arose upon government challenge to the procedure whereby the Court of Claims permitted petitioners in military claims pursuant to the Tucker Act to provide additional evidence for hearing by the court's trial commissioners.[3] The Court of Claims had been following this practice since at least 1944, as reflected in the extensive precedent annexed to the Brown opinion and reproduced in the margin.[4]

---

[3] The former trial arm of the Court of Claims is now the Court of Federal Claims, and the appellate arm was merged into the Court of Appeals for the Federal Circuit.

[4] The Brown court listed dozens of cases in which the court had followed this practice, including: Russell v. United States, 183 Ct. Cl. 802 (1968); Davis v. United States, 181 Ct. Cl. 1095 (1967); Reese v. United States, 180 Ct. Cl. 932 (1967); Dayley v. United States, 180 Ct. Cl. 1136 (1967); Brozik v. United States, 180 Ct. Cl. 546 (1967); Beckham v. United States, 375 F.2d 782 (Ct. Cl. 1967); Cooper v. United States, 178 Ct. Cl. 277 (1967); Harris v. United States, 177 Ct. Cl. 538 (1966); Imhoff v.

A year before the <u>Brown</u> decision, in <u>Beckham v. United States</u>, 375 F.2d 782 (Ct. Cl. 1967), reviewing a decision of the Board for the Correction of Naval Records, the Court of Claims explained that decisions of the correction boards are reviewed to determine whether they are "arbitrary, capricious, or unsupported by substantial evidence"—that is, the basic principles in the APA for review of informal adjudications— but the court explained that in applying this standard "it is not necessary that the review

<u>United States</u>, 177 Ct. Cl. 1 (1966); <u>Hoppock v. United States</u>, 176 Ct. Cl. 1147 (1966); <u>Wood v. United States</u>, 176 Ct. Cl. 737 (1966); <u>Powers v. United States</u>, 176 Ct. Cl. 388 (1966); <u>Hoffman v. United States</u>, 175 Ct. Cl. 457 (1966); <u>Walters v. United States</u>, 358 F.2d 957 (Ct. Cl. 1966); <u>Farrar v. United States</u>, 358 F.2d 965 (Ct. Cl. 1965); <u>Merson v. United States</u>, 173 Ct. Cl. 92 (1965), <u>remanded to commissioner for additional findings</u>, 173 Ct. Cl. 139 (1966); <u>Kingsley v. United States</u>, 172 Ct. Cl. 549 (1965); <u>Hutter v. United States</u>, 345 F.2d 828 (Ct. Cl. 1965); <u>Kurfess v. United States</u>, 169 Ct. Cl. 486 (1965); <u>Boland v. United States</u>, 169 Ct. Cl. 145 (1965); <u>Smith v. United States</u>, 168 Ct. Cl. 545 (1964); <u>Woodard v. United States</u>, 167 Ct. Cl. 306 (1964); <u>Bevins v. United States</u>, 166 Ct. Cl. 547 (1964); <u>Ferguson v. United States</u>, 166 Ct. Cl. 310 (1965); <u>Grubin v. United States</u>, 333 F.2d 861 (Ct. Cl. 1964); <u>Patten v. United States</u>, 161 Ct. Cl. 131 (1963); <u>Dickson v. United States</u>, 159 Ct. Cl. 185 (1962); <u>Rae v. United States</u>, 159 Ct. Cl. 160 (1962); <u>Harper v. United States</u>, 159 Ct. Cl. 135 (1962); <u>Nichols v. United States</u>, 158 Ct. Cl. 412 (1962); <u>McAulay v. United States</u>, 305 F.2d 836 (Ct. Cl. 1962), <u>cert. denied</u>, 373 U.S. 938 (1963); <u>Hoen v. United States</u>, 157 Ct. Cl. 235 (1962); <u>Lipp v. United States</u>, 301 F.2d 674 (Ct. Cl. 1962), <u>cert. denied</u>, 373 U.S. 932 (1963); <u>Salz v. United States</u>, 157 Ct. Cl. 172 (1962); <u>Adams v. United States</u>, 156 Ct. Cl. 289 (1962); <u>Frith v. United States</u>, 156 Ct. Cl. 188 (1962); <u>Thompson v. United States</u>, 156 Ct. Cl. 158 (1962); <u>Ludzinski v. United States</u>, 154 Ct. Cl. 215 (1961); <u>Furlong v. United States</u>, 153 Ct. Cl. 557 (1961); <u>Watson v. United States</u>, 152 Ct. Cl. 273 (1961); <u>Hendrick v. United States</u>, 150 Ct. Cl. 437 (1960); <u>Weiner v. United States</u>, 148 Ct. Cl. 445 (1960); <u>Siegel v. United States</u>, 148 Ct. Cl. 420 (1960); <u>Allin v. United States</u>, 147 Ct. Cl. 459 (1959); <u>Brown v. United States</u>, 143 Ct. Cl. 605 (1958); <u>Bowman v. United States</u>, 142 Ct. Cl. 367 (1958); <u>Friedman v. United States</u>, 158 F. Supp. 364 (Ct. Cl. 1958); <u>San Millan v. United States</u>, 153 F. Supp. 370 (Ct. Cl. 1957); <u>Furlong v. United States</u>, 152 F. Supp. 238 (Ct. Cl. 1957); <u>Uhley v. United States</u>, 147 F. Supp. 497 (Ct. Cl. 1957); <u>Griffith v. United States</u>, 135 Ct. Cl. 278 (1956); <u>Thompson v. United States</u>, 139 F. Supp. 935 (Ct. Cl. 1956); <u>Loth v. United States</u>, 137 F. Supp. 414 (Ct. Cl. 1956); <u>Lemly v. United States</u>, 91 F. Supp. 743 (Ct. Cl. 1950); <u>Ancker v. United States</u>, 116 Ct. Cl. 384 (1950); <u>Cook v. United States</u>, 101 Ct. Cl. 782 (1944).

This list does not include decisions following <u>Brown</u>, as I outline <u>post</u>. My colleagues' casual disposition of <u>Brown</u> as a unique and uninformed aberration is belied by history.

always be restricted to the record before the administrative body." Id. at 785 (citing K. Davis, Administrative Law Treatise, §29.07 (1958 ed.)). The court stated that it "permitted the taking of de novo evidence by the Trial Commissioner," and that the question before the court was whether the correction board's "decision meets the [substantial evidence] test when compared with all available evidence—that is both the record and the de novo evidence." Id.

In Brown, upon the government's challenge, the Court of Claims "t[ook] the occasion to reaffirm and elaborate the views we expressed in Beckham." Brown, 396 F.2d at 990. The serviceman Brown had been retired from the Army, and before his retirement he had requested evaluation for a service-connected disability, but he had not appeared before a Physical Evaluation Board ("PEB"). Brown's applications for relief, from the Army Board for the Correction of Military Records, were denied without a hearing.[5] On appeal to the Court of Claims, the trial commissioner permitted the submission of additional evidence. The government objected, leading to the court's extensive review of its procedures with respect to this area of agency action and judicial review.

The Court of Claims discussed the history of review of military administrative board rulings, and the factors relevant to augmentation of the record in this special area. The Brown opinion explained the limited scope of review typically afforded to administrative agency determinations, stating, as it had in Beckham, that an agency's decision is disturbed only when it is "arbitrary and capricious, inconsistent with

---

[5] These facts are strikingly similar to those of Mr. Walls, for Mr. Walls likewise did not appear before a PEB, and the correction board denied his applications without a hearing.

applicable statutes or regulations, or unsupported by substantial evidence." 396 F.2d at 991 (citing K. Davis, Administrative Law Treatise §29.01 (1958 ed.)). Our predecessor court explained why review of rulings of the military correction boards warrants adjustment of the usual administrative review procedures, and that this procedure has not "encroached on the administrative process":

> We have also, since we first began dealing with disability retirement two decades ago, regularly considered evidence over and above that presented before the administrative boards if a party wishes to offer it. See Appendix, infra, for a list of cases which is not exhaustive. This practice has prevailed over the years, with only sporadic objection and no real deviation by the court. This coupling of the substantial-evidence standard with the acceptance of new evidence has not, in the view we have expressed, encroached on the administrative process.

Brown, 396 F.2d at 991-92 (footnotes omitted) (Appendix citations supra at note 4).

The court in Brown discussed the government's argument—the same argument today adopted sua sponte by the panel majority—that APA principles require that judicial review be limited to the agency record. The government relied primarily on United States v. Carlo Bianchi & Co., 373 U.S. 709 (1963), in arguing that the administrative record could not be supplemented. In Carlo Bianchi the Supreme Court examined the Wunderlich Act, 41 U.S.C. §§321-322, which was enacted in 1954 to provide consistency to the handling of government contract disputes. The Court determined that the legislative intent, as well as the language of the Act, showed the purpose of limiting judicial review to the record before the agency's board of contract appeals. 373 U.S. at 714. This statute was directly relevant to proceedings in the Court of Claims, to which appeals were directed, and the Court explained that the Act changed the Court of Claims' prior procedure with respect to contract disputes.

However, as the <u>Brown</u> court discussed, the Wunderlich Act did not relate to the military correction boards, and its legislative history does not address judicial review beyond the context of the boards of contract appeals with which it was concerned. Nor has such relationship been uncovered in the forty years since <u>Brown</u> definitively explored the issue. For example the government in <u>Brown</u> had stressed the Court's general statement in <u>Carlo Bianchi</u> that "the reviewing function is one ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based," 373 U.S. at 714-15, and had argued that this renders unlawful the supplementation of the record of any agency. The Court of Claims observed, however, that in <u>Carlo Bianchi</u> the Court's review was confined to the statute governing appeals from the boards of contract appeals, and that "[n]o rigid, inexorable principles of judicial review were announced or sought to be established." <u>Brown</u>, 396 F.2d at 992. The court stated that "[i]t does not follow that review on the administrative record alone is the sole possibility in every type of case, no matter how different the pertinent factors or the background." <u>Id.</u> at 993.

The court in <u>Brown</u> explained that the "usual practice" of limiting judicial review to the agency record does not apply to every administrative regime, and directed attention to various exceptions to this "usual practice." <u>Id.</u> For example, in <u>Jordan v. United Insurance Co. of America</u>, 289 F.2d 778 (D.C. Cir. 1961), the court held that, in review of a certification decision of the D.C. Insurance Superintendent, the district court properly did not limit its review to the administrative record, the court pointing out that the relevant statutes did not provide for an administrative hearing and did not impose limits on judicial review. <u>Id.</u> at 782-83. The <u>Jordan</u> decision, like the <u>Brown</u> decision,

has never been overruled.  See, e.g., Chamber of Commerce v. Reich, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (citing Jordan favorably).  I again point out that the statutes relevant to the military correction boards do not guarantee an administrative hearing and do not impose any limits on judicial review.

The Brown court also referred to the statutes that provide for civil actions to obtain a patent or to contest Patent Office interference decisions, pursuant to 35 U.S.C. §§145 & 146.  E.g., California Research Corp. v. Ladd, 356 F.2d 813, 820 n.18 (D.C. Cir. 1966) ("A proceeding in the District Court under 35 U.S.C. 145 is a proceeding de novo in equity, and while limited to the invention claimed in the Patent Office, it is heard not only on the record of that office but on all competent evidence adduced and heard on the merits.").  The Brown court also mentioned tax cases, in which the taxpayer may introduce new evidence in court to challenge an IRS ruling.  The Brown court also cited United States v. First City National Bank of Houston, 386 U.S. 361 (1967), in which the Court held that the Bank Merger Act of 1966, 12 U.S.C. §1828, does not preclude de novo judicial review of the Comptroller of the Currency's decisions concerning approval of bank mergers.

These and other examples cited by the Brown court, see 396 F.2d at 993 & nn.10-11 (collecting cases), show that while the usual practice is to limit judicial review to the administrative record, particularly where the agency procedure was formalized and afforded ample opportunity to develop a sufficiently reviewable record, exceptions to the usual practice are "by no means unique," id. at 997.  This variety is not surprising, for the APA itself states various standards of review applicable in different contexts, as I shall discuss in connection with 5 U.S.C. §706 ("Scope of review.").

The Brown court discussed specific aspects of the military's disability-retirement boards and record correction boards, explaining that they may require a more flexible judicial review than in the typical regulatory agency context. The court observed that the statutes establishing the correction boards "do not refer to judicial review, much less to the procedure to be used on review. Nor is there any other indication that Congress, at any time, intended to restrict our consideration to the evidence before the administrative bodies." 396 F.2d at 992. The court cited an article by Professor Meador, which explains the rather complex history of judicial review of military concerns, and that the special path of review in the Court of Claims under the Tucker Act differs from the typical review of agency decisions by district courts. See Maj. Daniel J. Meador, Judicial Review in Military Disability Retirement Cases, 33 Mil. L. Rev. 1, 17 (1966).

The court also mentioned the various administrative avenues a claimant seeking military disability pay can pursue before reaching the Court of Claims: the claimant might appear before a PEB, and appeal its decision to a review council and then to an appeal board within the military service; or he might apply directly to the correction board, where he generally does not receive a hearing[6] and where the correction board may receive information and advice from the military service without participation of the claimant. The court cogently observed that "[t]he nature of the administrative record varies with the process the claimant receives," Brown, 396 F.2d at 994-95, in explaining

---

[6] The current regulations of the military services state, as they did in the era when Brown was decided, that applicants do not have a right to a hearing. See 32 C.F.R. §581.3(f) (Army); id. §723.3(e)(1) (Navy); id. §865.4(f) (Air Force).

why the administrative record that reaches the Court of Claims may or may not be adequate to afford full and fair review of the claimant's case.

The Court of Claims observed that the administrative record is typically incomplete when there has not been a hearing. Id. at 995. The court stated that even when a claimant is afforded a hearing by a correction board, the military service generally does not produce live witnesses, and provides only written materials, sometimes including an advisory opinion from service officials that has not been made available to the claimant. See id. The Brown court concluded, of the military correction boards, that "[t]hey do not sit as tribunals adjudicating disputes between adverse parties, and they do not have the procedures of such tribunals." Id. It is surely apparent that a pro se claimant in such an informal proceeding may not produce the depth of legal argument and evidence as might be helpful should judicial review be warranted, or may not produce the argument and evidence that might be required by a reviewing court not expert in military matters.

The Court of Claims emphasized that the military correction boards do not make policy, and that "their job is to pass upon a particular case under the standards handed down to them," id. at 996, stressing the role of the factual evidence as to each petitioner. The court stated that the system "is not designed to collect and evaluate for itself all the evidence bearing on the issue of disability, nor is it geared to produce records comparable to those of the regulatory agencies." Id. The court described the "non-adversary records" provided by the correction boards as "too infirm and incomplete" to "form the sole basis for a judicial decision." Id. at 997. The court also observed that this system "is such that court intervention, by way of the augmentation of

evidence, will interfere much less with the carrying on of this administrative function than is true for many other administrative bodies." Id. at 996.

In light of these special aspects of the administrative regime for military pay cases, the Court of Claims concluded that its long-standing practice of accepting supplemental evidence was appropriate. The Brown court described its reasons for permitting augmentation of the record in correction board cases as "bolted to the particular machinery of this administrative operation." Id. at 1000. The court observed that it could have "taken the other road when [it] first began to get these cases in the 1940s," observing that if it had, the course of its rulings would have pressed the military services to "afford fuller, adversary, more trial-type hearings, and in a larger proportion of the cases, and also to prepare more extensive opinions and factual findings." Id. at 1000 (footnote omitted). But, that path not having been taken, the military services' administrative processes had evolved in light of the settled expectation that further evidence could be taken on judicial review. The court concluded: "At least without radical changes in the services' procedures, we see no need and no adequate ground for altering [our] long-standing practice." Id.

B

The Brown ruling continues to be the law of this circuit.[7] In Bray v. United States, 515 F.2d 1383 (Ct. Cl. 1975), the court cited Brown in ruling that acceptance of

---

[7] Other appellate courts have also recognized the Brown principle. See, e.g., Nolen v. Schlesinger, 492 F.2d 787, 788 (5th Cir. 1974) ("It is firmly established that in cases of this type, where the agency is not required to hold a formal hearing, de novo evidence may be presented to the court."), aff'd after remand, 535 F.2d 888 (5th Cir. 1976); Williams v. Robinson, 432 F.2d 637, 642 n.17 (D.C. Cir. 1970) ("Occasionally, developments subsequent to the administrative determination may warrant the presentation of additional factual material.").

supplemental evidence was appropriate in a former service-member's challenge to his discharge for unfitness for duty. Noting that the Air Force Board for Correction of Military Records had not afforded Bray a hearing, the court rejected the government's argument that supplemental evidence was unwarranted, stating that "the de novo proceeding in a military pay case generally elicits evidence that is new to the case." Id. at 1387, 1390. The court repeated the Brown court's observation that augmentation of the record to repair gaps and deficiencies did not impinge unduly on administrative expertise or discretion, because the "substantial-evidence standard gives precedence to the administrative rulings when the record is viewed with the de novo evidence included in the whole." Id. at 1391.

The Court of Claims revisited Brown shortly before that court's merger into the Federal Circuit, in a suit for disability retirement pay by a former Air Force colonel. In de Cicco v. United States, 677 F.2d 66 (Ct. Cl. 1982), the court stated the usual scope of review of administrative determinations ("whether the decision of the Correction Board is arbitrary, capricious, unsupported by substantial evidence, or contrary to applicable statutes and regulations"), and observed that the claimant had presented no new evidence, and thus had not provided a basis for a de novo hearing. The court acknowledged the Brown rule permitting additional evidence, yet observed that supplementation of the record is not required when "the parties in this court have nothing new to add." Id. (quoting Brown, 396 F.2d at 999). The de Cicco court thus recognized that agency actions warrant deference, but that supplementation of the administrative record is allowed to aid in judicial review.

The Brown decision was adopted as binding precedent upon this court's formation. See South Corp. v. United States, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (en banc) (adopting the precedent of the Court of Claims and the Court of Customs and Patent Appeals). Soon thereafter, the Federal Circuit applied Brown in Heisig v. United States, 719 F.2d 1153 (Fed. Cir. 1983). Heisig involved the appeal of a denial by the Army Board for the Correction of Military Records of an application to correct an honorable discharge to a medical disability retirement. The appeal was taken to the district court under the Little Tucker Act, providing the occasion for this court to hold that district courts should apply the same principles of review established by the Court of Claims in Brown:

> Appellant was entitled to offer de novo evidence in his presentations to the PEB, to the correction board, and to the district court. Under the substantial evidence rule, all of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion.

Heisig, 719 F.2d at 1157 (footnotes omitted). The Heisig court concluded that the district court had properly applied this standard. Id. at 1157-58.

Brown has since continued to be applied. See, e.g., Golding v. United States, 48 Fed. Cl. 697, 728-29 (2001) (augmenting the administrative record in case involving disenrollment from the Naval Academy based on medical problems); Bosch v. United States, 27 Fed. Cl. 250, 262 (1992) ("In citing to Brown, the court in De Cicco, a disability retirement case, stated that a plaintiff is not entitled to a trial de novo, but, simply that de novo evidence may be allowed if it is new to the case, not merely to the court."), aff'd, 11 F.3d 1070 (Fed. Cir. 1992) (Table); Lyons v. United States, 18 Cl. Ct. 723, 727 (1989) (accepting plaintiff's evidence beyond the administrative record

pursuant to <u>Brown</u>), <u>aff'd</u>, 907 F.2d 157 (Fed. Cir. 1990) (Table).  In this case, the Court of Federal Claims accepted Mr. Walls' affidavit in explicit reliance on the <u>Brown</u> line of precedent.  <u>See</u> <u>Walls v. United States</u>, No. 05-533 C, 2008 WL 4708115 at *18 (Ct. Fed. Cl. Aug. 20, 2008) (citing <u>Beckham</u> and <u>Bray</u>).  In some cases the Court of Federal Claims has remanded back to the correction board, depending on the specific facts.  I have found no case that suggests that <u>Brown</u> has been overruled, <u>sub silentio</u> or otherwise, by the Supreme Court or any other court.

The rule permitting augmentation of the administrative record on judicial review of a decision of a military correction board is the law of this circuit.  While the panel majority stops just shy of explicitly declaring <u>Brown</u> bad law, its condemning language nonetheless creates conflict and uncertainty, for "earlier decisions prevail unless overruled by the court <u>en banc</u>, or by other controlling authority such as intervening statutory change or Supreme Court decision."  <u>Texas Am. Oil Corp. v. U.S. Dep't of Energy</u>, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (<u>en banc</u>).  There has been no change in statutory law, nor any <u>en banc</u> decision of this court overruling <u>Brown</u>.  No Supreme Court decision has overruled <u>Brown</u>, either explicitly or implicitly.  Contrary to the pronouncement of the panel majority, no authority has disturbed this precedent; I shall discuss this further in Part II, for until today's excursion there was no conflict, real or apparent.

II

The panel majority today adopts the position that was definitively rejected by precedent, now extracting rejected "rigid, inexorable principles of judicial review," <u>Brown</u>, 396 F.2d at 992, from authorities that do not establish such an unyielding rule.

The cases the panel majority cites merely illustrate the usual practice under the APA of limiting judicial review to the administrative record in appropriate contexts—a practice well recognized by the Brown court. No authority disturbs the long-standing rulings that because of the nature of correction board proceedings, augmentation of the administrative record is permissible. The APA does not exclude this approach.

Nonetheless, the panel majority proposes that the APA requires that judicial review of every agency determination is limited to the administrative record. See Maj. op. at 15-16. This is a grievous oversimplification, for even the strongest statements of limited judicial review contain the caveat "usually" or "generally"—not "always" and not "inexorably." The APA provides important standardization of administrative procedures, but also recognizes the number and diversity of administrative agencies, and does not prescribe a single procedure to fit every agency, whatever its charge. Nor does the APA prescribe identical rules for judicial review of every agency action. The Court has not held otherwise. To the contrary, the APA accommodates the reality of diverse agency functions, with sufficient range to facilitate, not inhibit, the agency's assignment.

The APA serves many kinds of agency proceedings: rulemaking is different from adjudication; formal proceedings are different from informal ones. For example, formal adjudications within agencies are generally subject to the procedural protections of 5 U.S.C. §§556 and 557, but informal adjudications face no such specific procedural requirements. Whether an adjudication is formal, in turn, is determined by reference to 5 U.S.C. §554, which provides: "This section applies, according to the provisions thereof, in every case of adjudication required by statute to be determined on the record after opportunity for an agency hearing . . . ." Thus, an agency adjudication is deemed

formal under the APA, and subject to the requirements of §§556 and 557, only when the agency's authorizing statute requires a hearing with trial-type procedures. See K. Davis, Administrative Law Treatise §10.7 (1979 ed. & 1989 supp.) ("An adjudication required to be 'determined on the record after opportunity for an agency hearing' is the same as an adjudication required to be determined after opportunity for trial, or for a trial-type hearing, or for a formal hearing.").

As the Brown court observed, neither the statute establishing the military correction boards nor the regulations under which they conduct proceedings requires an agency hearing. Thus decisions of the correction boards are not viewed under the APA as formal adjudications.

The APA also treats formal and informal agency adjudications differently with respect to judicial review, prescribing "review[] on the record of an agency hearing" only for formal proceedings subject to the requirements of 5 U.S C. §§556 and 557 or otherwise statutorily required to be conducted by formal hearing, in subsection (2)(E):

> **5 U.S.C. §706**  To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
>> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>> (B) contrary to constitutional right, power, privilege, or immunity;
>>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>> (D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

Apart from review of decisions made upon formal hearing records, §706(2) does not limit judicial review to a closed record. In <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402 (1971), the Court referred to the "narrow, specifically limited situations" where the closed-record "substantial evidence" standard of §706(2)(E) applies:

In all cases agency action must be set aside if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or if the action failed to meet statutory, procedural, or constitutional requirements. In certain narrow, specifically limited situations, the agency action is to be set aside if the action was not supported by "substantial evidence." And in other equally narrow circumstances the reviewing court is to engage in a <u>de novo</u> review of the action and set it aside if it was "unwarranted by the facts."

401 U.S. at 413-14 (citations omitted). While the principles of substantial evidence review have been applied to informal agency decision-making, as illustrated in <u>Brown</u>, the Court has never held that the rigor of §706(2)(E)'s restriction to a closed record applies to every kind of adjudication, formal or otherwise. No precedent has required that the same rules apply to agency adjudications upon full formal hearing, and to informal adjudications without a hearing, as in Walls' case.

As I have discussed, extensive judicial precedent surrounds the review procedure for military correction board decisions. The Court of Federal Claims, applying this precedent, received Mr. Walls' supplemental affidavit and heard his

argument discussing all of the evidence now presented. The panel majority states categorically that Supreme Court decisions prohibit this procedure. However, none of the cases cited by the majority is of this effect. To the contrary, the Court continues to recognize that rigid rules are inapplicable in the complex environment of federal administrative agencies.

The majority relies primarily on Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985). The Court in Florida Power, discussing judicial review of a decision of the Nuclear Regulatory Commission, stated that "[t]he reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed," and that where the administrative record is inadequate to enable review "the proper course, except in rare circumstances, is to remand to the agency." Id. at 744. In the context of the licensing of nuclear power plants, that conclusion has logical force. In the context of individual military pay or retirement, the equities and issues may warrant greater flexibility. The Court did not prohibit all exceptions, even as it recognized that the agency is "generally" in the best position to continue its inquiry. The Court was obviously knowledgeable that exceptions exist for some agency practice. It is such an exception that the Brown court reaffirmed, with painstaking explanation of why greater liberality may be warranted in appeals of rulings of the military correction boards.

Florida Power dealt with the path of appellate review established in specific provisions of the Hobbs Act, 28 U.S.C. §§2342(4) and 2239, in a case involving the Nuclear Regulatory Commission's denial of a citizen protest to a licensing decision. The question was not whether the APA applied, or which of the APA standards of review applied; the question was whether the Hobbs Act provided for appeal directly to

the court of appeals, or whether appeal is to be taken first to the district court. See 470 U.S. at 735 n.8 ("In these cases we only address the question whether initial subject-matter jurisdiction is properly located in the court of appeals or the district court. That is the only question on which we granted certiorari, and it is the only question that the parties have briefed and argued before this Court."). The Court found the statutory language ambiguous and looked to the legislative history, concluding that it was more likely that Congress intended direct appeal to the court of appeals because of the subject matter at issue, which was the granting or revocation of a license for nuclear power. The issue presented—one of statutory interpretation based on congressional intent—was quite distinct from the question for which the majority relies on Florida Power.

In its discussion of the legislative history, the Court in Florida Power commented on judicial review of agency determinations generally. The Court acknowledged that direct review in the court of appeals could be disadvantageous because if the Commission did not conduct a hearing the appellate court might lack an adequate factual record to review, whereas "a district court with factfinding powers could make up that deficiency." Id. at 743. However, the Court concluded that for Hobbs Act proceedings "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." Id. (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). In Camp this statement refers to the "arbitrary and capricious" test of 5 U.S.C. §706(2)(A), which was the only test applied in that case. Camp had nothing to say about whether augmentation of the record is permitted in applying substantial evidence review to an informal adjudication, which is

the question that was asked and answered in Brown. The decision in Florida Power cannot reasonably be held to bar the authority of a trial court to allow supplementation of the record of a decision arising from the informal proceeding of a military correction board.

The panel majority also cites Marsh v. Oregon Natural Resource Council, 490 U.S. 360, 375-78 (1989), implying that it undermined or overruled this court's precedent. In Marsh the Court considered the appropriate standard of review for a decision of the Army Corps of Engineers not to prepare a supplement to an environmental impact statement in connection with the Elk Creek Dam in Oregon. The Court concluded that the "arbitrary and capricious" standard of the APA should be applied to the Corps' decision, rejecting the plaintiffs' argument that the district court should not apply this deferential APA standard, but must make its own determination of reasonableness of the decision. The Court determined that the agency decision "involves primarily issues of facts" and "requires a high level of technical expertise," id. at 377, and therefore that its action merited the deference of the arbitrary and capricious test. Marsh did not rule that all judicial review of all agency decisions is limited to the administrative record. Marsh provides no support for the majority's thesis.

The panel majority nonetheless proposes that cases such as Florida Power and Marsh stand for a new principle of APA review, a principle that evolved after the Brown decision. That proposal is curious, for the "usual practice" of limiting review of agency decisions to the administrative record was not a new idea articulated for the first time in the 1980s. This "usual practice" was mentioned by the Brown court itself, see Brown, 396 F.2d at 993 ("Though judicial review limited to the evidence adduced before the

agency is the usual practice, there are exceptions, comparable to our own . . . ."), leading the Court of Claims to explain why exception from this usual practice was demanded by the circumstances of the military correction boards. The Court in Florida Power did not state a new rule. Indeed, nearly identical statements can be found in earlier Court precedent, such as Carlo Bianchi, 373 U.S. at 714-15 ("the reviewing function is one ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based" (emphasis added)).

It is not news that the APA imparted general uniformity to the procedures employed by the many diverse federal agencies, and codified existing principles of judicial review. See K. Davis, Administrative Law Treatise §29:1 (1984 ed.) ("The Administrative Procedure Act, enacted in 1946, summarizes the scope of review, but its provisions are almost entirely a codification of previously existing law."). The suggestion that review on the agency record did not emerge as the general practice until Florida Power was decided is incorrect, as is the suggestion that Florida Power overruled or undermined Brown and the dozens of correction board cases before and after Brown.

Other decisions of the Court from the same era, far from supporting the majority's thesis, recognize circumstances in which the presentation of additional evidence is appropriate during judicial review of an administrative ruling—indeed that even trial de novo may be appropriate in certain contexts. For instance, Chandler v. Roudebush, 425 U.S. 840 (1976), involved a discrimination complaint by a federal employee, pursued first by administrative remedy before the Civil Service Commission, and then by proceedings in the district court. The plaintiff sought a "plenary judicial trial de novo,"

while the government argued that §717(c) of the Civil Rights Act of 1964, which provides for a "civil action," limits review to the administrative record. Relying on the term "civil action," as well as other provisions in the statute and its legislative history, the Court held that the employee is entitled to a trial de novo and is not limited to the agency record. The Court stated that "[i]n most instances, of course, where Congress intends review to be confined to the administrative record, it so indicates," id. at 862 n.37, and found no such limitation in the statute before it. The Brown court similarly observed that the statute for the military correction boards contains no suggestion that Congress intended review to be limited strictly to a closed record. It is plain that the Court did not adopt a categorical and all-purpose application of the APA, nor did the Court overrule or undermine our precedent relating to the correction boards.

The panel majority also cites several court of appeals decisions that applied the APA to decisions of the military correction boards. See Maj. op. at 15 n.11. There is nothing unusual in these decisions, for Brown itself applied the APA principles of review, as explained above. The supplementation of the record that is permitted by precedent is not negated by the use of a deferential APA standard of review as applied to the entirety of the record including any supplemental evidence, as the Brown court recognized.

The panel majority also cites decisions of this court relating to judicial review of government contract bid protests, including Axiom Resource Management, Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009), and Impresa Construzioni Geom. Domico Garufi v. United States, 238 F.3d 1324, 1338 (Fed. Cir. 2001). Maj. op. at 16, 17. It scarcely requires mention that bid protests, where commercial entities are

represented by counsel in highly structured high-stakes proceedings, are far removed from the military correction boards, where individual servicepersons, without counsel, attempt to establish their concerns.

Not only do bid protest cases have no role in overruling Brown, but inspection of these cases reveals that they support the flexibility that underlies Brown. In Axiom this court recognized that supplementation of the agency record is sometimes warranted in the trial court, even in the bid protest context, and held that the trial court's decision to supplement the record was reviewable only under the abuse of discretion standard. 564 F.3d at 1379-80. And in Impresa supplementation of the record was not only permitted, it was requested by this court. 238 F.3d at 1338-40. It is hard to see how these decisions impugn the Brown precedent.

Finally, the panel majority suggests that this court's recent decisions in correction board review cases have somehow cast doubt on the Brown precedent, citing Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006), and Levine v. United States, 453 F.3d 1348, 1350 (Fed. Cir. 2006). But the suggestion is inaccurate, for neither Metz nor Levine presented a question of augmentation of the evidence in the administrative record. The court therefore had no occasion to revisit the Brown decision. The issue in Metz was whether the plaintiff had waived a specific legal theory by failing to raise it before the correction board. There was no issue of supplementing the record with new evidence, for Metz did not ask the court to do so. See 466 F.3d at 999 ("Metz has not asserted that any of the extremely limited situations in which the Court of Federal Claims may hear 'extra-record' evidence are applicable to his case . . . ."). The statement in Metz that the majority quotes, that the standard of review "necessarily

limits the Court of Federal Claims' review to the administrative record," 466 F.3d at 998, did not relate to supplemental evidence, but to the entirely new legal argument that Metz had attempted to pursue on appeal. In support of this statement, the Metz court cited Cunkelman v. United States, 229 Ct. Cl. 857 (1982), but in that case, too, the petitioner did not seek to introduce any supplemental evidence, leaving the court with only the administrative record. Similarly, in Levine the claimant made no effort to introduce evidence outside of the administrative record, although this court acknowledged the possibility of such augmentation. See 453 F.3d at 1350 ("Review of the Board's judgment may be made on the administrative record when supplementation is not required for meaningful judicial review." (quotation marks omitted)).

These cases did not raise the issue of the Brown rule, and did not cite Brown or any of the dozens of cases applying the Brown principle. A change of long-established law is not made by hint or innuendo. Our obligation is to provide trustworthy law, on which the public and the trial courts can rely. There is no basis in precedent for the proposition that this court has rejected Brown and the vast number of cases that have applied that decision.

III

Petty Officer Walls acted pro se before the Correction Board, but obtained pro bono counsel for the subsequent judicial proceedings. Perhaps that is what prompted the submission to the Court of Federal Claims of supplemental information about his activities at the Naval Hospital, for the Correction Board had criticized his support for this argument. My colleagues now imply that Mr. Walls held back this evidence from the Correction Board, in order to present it to the court on appeal. Maj. op. at 17. There

is no suggestion by the government of such nefarious intent, and this court's characterization is puzzling. It is unimaginable that a pro se claimant would deliberately sabotage his case before the Correction Board, in order to incur the delay and expense and uncertainty of judicial review. To be sure, the Brown court recognized the possibility that the privilege of augmentation of the record might be abused, although the court found "no basis in experience for concluding that disability-retirement applicants . . . withhold evidence from the administrative boards with the view of introducing it in court, and we see no reason to suppose that they do." Brown, 396 F.2d at 998. The Brown court left it to the sound discretion of the trial court to exclude the evidence in such an unlikely situation. Id. at 998-99. Here, there is no hint that this single affidavit on a single issue reflects a gaming of the system. Nor do my colleagues explain how the trial court abused its discretion in allowing this supplemental evidence in this case. This charge is incongruous.

CONCLUSION

No statute or precedent has disturbed the holding of Brown or undermined its reasoning. The government did not raise this issue. My colleagues' suggestion that the Court of Federal Claims hereafter must reject supplemental evidence in military correction board cases is contrary to the precedent that binds this court.

The panel majority's proposal that in this case there should be a remand for further consideration of Mr. Walls' supplemental affidavit, apparently because this court has changed the law without warning, does not reduce the impropriety or cure the error of the majority's position. This is not how precedent can be changed. If the majority of the judges of this court believe that we and our predecessor court have been in error for

these many years, let us act <u>en banc</u> and correct our error.  The creation of conflict and doubt within a panel decision does not serve the judicial obligation to provide stable law, on which concerned persons and tribunals can rely.

I respectfully dissent.